**ANDERSON & KARRENBERG**
Jared D. Scott (#15066)
Jacob W. Nelson (#16527)
50 West Broadway, Suite 600
Salt Lake City, UT 84101-2035
Telephone: (801) 534-1700
jscott@aklawfirm.com
jnelson@aklawfirm.com

**GREENWALD DAVIDSON RADBIL PLLC**
Jesse S. Johnson (to seek admission *pro hac vice*)
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Telephone: (561) 826-5477
jjohnson@gdrlawfirm.com

*Counsel for Plaintiff and the proposed class*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LEONARD GONZALES, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>SKYFINE USA, LLC,<br><br>       Defendant. | **CLASS ACTION COMPLAINT**<br><br>(**Jury Trial Demanded**)<br><br>Case No. _____<br><br>Honorable _____ |

### NATURE OF THE ACTION

1.     Leonard Gonzales ("Plaintiff") brings this class action against SkyFine USA, LLC ("Defendant") under the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667, and its

implementing regulations, 12 C.F.R. § 1013 *et seq.* ("Regulation M"), on behalf of himself and other similarly situated customers.

2.      Plaintiff alleges that Defendant violated the CLA and Regulation M by providing confusing and insufficient payment disclosures in its ignition interlock device lease agreements.

3.      By virtue of these faulty disclosures, Plaintiff and other lessees rented ignition interlock equipment from Defendant without understanding their true financial obligations—the very concern that brought about the enactment of the CLA in the first place.

4.      Had Plaintiff understood the true financial responsibilities of Defendant's lease agreement, he would not have signed it.

5.      "Congress enacted the CLA as an amendment to the [Truth in Lending Act ("TILA")] and [thereby] extended the TILA's credit disclosure requirements to consumer leases." *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001).[1]

6.      Both the CLA and TILA serve to protect consumers from obfuscation or misinformation in credit and lease transactions that are otherwise ripe for misunderstandings.

7.      In other words, Congress recognized and sought to remedy the information imbalance in credit and lease transactions, as many consumers lack the financial experience and wherewithal of those sophisticated companies with whom they do business.

8.      Defendant's form ignition interlock lease agreements with Plaintiff and the putative class members are defective for the same reasons: they fail to give clear and sufficient

---

[1]      Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted.

financial disclosures required by the CLA and Regulation M, in a manner that satisfies the statute and its regulations.

## PARTIES

9.      Plaintiff is a natural person who, at all relevant times, resided in Orange County, California.

10.     Plaintiff is a "lessee" as defined under the CLA, 15 U.S.C. § 1667(2).

11.     Defendant identified Plaintiff as the lessee in the lease agreement that Plaintiff signed.

12.     Defendant is a limited liability company with principal offices in Draper, Utah.

13.     Defendant offers ignition interlock leasing services throughout the country, including in Plaintiff's home state of California.

14.     Defendant describes itself as a "Leading manufacturer, and distributor of ignition interlock devices (IID), breath alcohol tester products."[2]

15.     Defendant boasts of being an

ISO 9001 certified manufacturer and provider of alcohol monitoring devices and technology, headquartered in Draper, UT. SkyFineUSA manufactures various alcohol monitoring devices/software systems, including Ignition Interlock Devices, Police Grade Breathalyzers, Commercial Ignition Interlock Devices, Portable Alcohol Monitoring Devices, Professional/Personal Use Breathalyzers, Offender Monitoring Software, IID Calibration Testing Software, GPS Monitoring Software.[3]

16.     According to Defendant's website:

---

[2]      https://www.skyfineusa.com/ (last June 9, 2023).

[3]      https://www.skyfineusa.com/about (last June 9, 2023).

Our Ignition interlock AT588 and our breathalyzers by SkyFineUSA has [*sic*] been created and tested in the USA. We have our main headquarters in Sandy, Utah, and we have numerous shops in different states throughout the nation. We also have expert installers and service centers on hand so that we can deliver the best product and services to our clients.[4]

17.    Defendant leases its ignition interlock devices to drivers throughout Utah and California through use of "consumer leases" as defined under the CLA, 15 U.S.C. § 1667(1).

18.    Thus, Defendant is a "lessor" as defined by 15 U.S.C. § 1667(3).

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction under 15 U.S.C. § 1667d(c) and 28 U.S.C. § 1331.

20.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), as Defendant maintains its principal place of business in this district.

## BACKGROUND OF THE CLA

21.    The CLA at its core requires disclosure of important lease terms—particularly financial terms—to protect consumers entering into lease arrangements.

22.    "Passed by Congress as an amendment to the Truth In Lending Act [], the CLA purports 'to assure a meaningful disclosure' of personal property lease terms to 'enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing.'" *Gaydos v. Huntington Nat. Bank*, 941 F. Supp. 669, 672 (N.D. Ohio 1996) (quoting 15 U.S.C. § 1601(b)).

23.    In other words,

---

[4]    https://www.skyfineusa.com/ (last June 9, 2023).

[b]ecause lease financing had become recognized as an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to enable comparison of lease terms with credit terms where appropriate. The CLA thus requires lessors of personal property subject to its provisions to make specified disclosures when a lease is entered into.

*Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999).

24.     TILA's "strict liability standard attaches to violations of CLA disclosure requirements as well." *Gaydos*, 941 F. Supp. at 672.

25.     Also important, "TILA reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Layell v. Home Loan & Inv. Bank, F.S.B.*, 244 B.R. 345, 350 (E.D. Va. 1999).

26.     Given that Congress enacted the CLA within the same statutory provisions as TILA, this same philosophy applies with equal force to the CLA and Regulation M.

## LEASE DISCLOSURE REQUIREMENTS

27.     To that end, the CLA and Regulation M require several types of disclosures in a consumer lease, all of which must be made in a clear and conspicuous manner, and certain of which also must be made in a "segregated" manner—meaning they must be set apart from the other lease terms. 12 C.F.R. pt. 1013.3(a)(2).

28.     Such requisite "segregated" disclosures include the amount due at lease signing or delivery; the number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments; the total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments; and the total of all payments due under the lease, with a description such as "the amount you will have paid by the end of the lease." 12 C.F.R. pt. 1013.4.

29.    And per 12 C.F.R. pts. 1013.3 and 1013.4, these segregated disclosures must "be provided in a manner substantially similar to the applicable model form in appendix A" of Regulation M.

30.    So, if a lessor chooses *not* to use the model form attached to the implementing regulations (and attached here as Exhibit A), the requisite "segregated" disclosures must be given in a manner at least "substantially similar to" that model form.

31.    These requirements for "segregated" disclosures date back to 1996, when the Board of Governors of the Federal Reserve System ("Board") conducted a review of Regulation M to ensure its continued and adequate protection of consumers.[5]

32.    Among the Board's observations in 1996: "The major revision to this section [of Regulation M] . . . is the requirement to segregate certain disclosures from other information. Clear and conspicuous lease disclosures must be given prior to consummation of a lease on a dated written statement that identifies the lessor and lessee." 61 FR 52246-01, 52249 (Oct. 7, 1996).

33.    The Board amended paragraph 3(a)(1) of Regulation M [12 C.F.R. pt. 1013.3(a)(1)] as follows:

> Former §§ 213.4(a)(1) and 4(a)(2) required that all disclosures be made together on a separate statement or in the lease contract "above the place for the lessee's signature." The Board has deleted this requirement along with the meaningful sequence, same-page, and type-size disclosure requirements, replacing them with the requirement that disclosures be segregated. Most commenters generally supported the proposed segregation requirement, although some commenters opposed the deletion of the other requirements. They believed that the signature

---

[5]    The Board remained tasked with oversight of the CLA and Regulation M until the creation of the Consumer Financial Protection Bureau ("CFPB") in 2011, at which time the CFPB assumed the Board's role with respect to such oversight.

requirement ensured that lessors would give disclosures before the consumer becomes obligated on the lease and discouraged lessors from putting important information on the back of a lease document. The Board believes that a segregation requirement and the clear and conspicuous standard provide the same level of protection as the previous rules.

The segregated disclosures and other CLA disclosures must be given to a consumer at the same time. Lessors must continue to ensure that the disclosures are given to lessees before the lessee becomes obligated on the lease transaction. For example, by placing disclosures that are included in the lease documents above the lessee's signature, or by including instructions alerting a lessee to read the disclosures prior to signing the lease.

Nonsegregated disclosures need not all be on the same page, but should be presented in a way that does not obscure the relationship of the terms to each other.

*Id.*

34.    The Board also amended paragraph 3(a)(2) [12 C.F.R. pt. 1013.3(a)(2)] as

follows:

Most commenters—representing both the industry and consumer groups—generally supported some form of segregation of leasing disclosures**. Many commenters believed that consumers would be more likely to read and understand the disclosures if key items were segregated from other disclosures and contract terms.** Pursuant to its authority under section 105(a) of the TILA, **the Board has adopted the requirement that certain consumer leasing disclosures be segregated from other required disclosures and from general contract terms to assure clear, conspicuous, and meaningful disclosure of lease terms.**

Some commenters, including trade groups that represent a large portion of the motor vehicle leasing industry, suggested that the more important disclosures be further highlighted in a manner similar to the Board's Regulation Z. **The Board believes that the segregation requirement and the requirement that disclosures be in a form substantially similar to the applicable model form in appendix A adequately focuses the consumer's attention on key information.**

Lessors may provide the segregated disclosures on a separate document or may include them in their lease contracts, apart from other information. The general content, format, and headings for these disclosures should be substantially similar to those contained in the model forms in appendix A. Lessors may continue to

provide the remaining disclosures required by Regulation M and the CLA in a nonsegregated format.

The model forms in Appendix A for open-end leases, closed-end leases, and furniture leases have been revised.

*Id.*

## FACTUAL ALLEGATIONS

35.    On or about November 23, 2021, Plaintiff signed one of Defendant's form ignition interlock device leases.

36.    A copy of Plaintiff's November 23, 2021 lease agreement with Defendant is attached as Exhibit B (the "Lease").

37.    Plaintiff leased an ignition interlock device from Defendant for personal, family or household purposes—namely, for use in his personal vehicle.

38.    The lease term is twelve months, as indicated on the first page of the Lease. Ex. B at 1.

39.    The Lease describes the subject "Property" or "System" as a "SkyFineUSA AT588 Ignition Interlock System including breath analyzing device, data collection system, electrical wire harness, mounting bracket (if required) and mouthpiece." *Id.* at 2.

40.    On the second page of the Lease, under the heading "**Fees & Payments**," Defendant states:

Lessee agrees that all charges ran through the SkyFineUSA system require a 3.5% payment processing fee. Any declined payments or payments not received, will be assessed a $25.00 late fee, if not paid within 5 business days. This $25 fee will be due each 5 business days that payment is not received (reference Interlock Training Checklist on the last page).

*Id.*

41.     On the third page of the Lease are two separate tables listing various fees and charges.

42.     In the first table, Defendant states that "[t]he following amounts shall be paid by the Lessee beginning on the commencement date of this lease and continuing until termination of this agreement":

| | |
|---|---|
| **Standard Installation Fee: $100.95 & Up** 0.00 | **Equipment Lease per Month** 59.95 |
| | |
| **$35.00 DMV/Court Submission Fee (due at the time of installation)** 35.00 | **Insurance (Per Month): $5.50** 5.5 |

*Id.* at 3.

43.     In the second table, Defendant presents additional "fees plus tax [that] may apply especially if Lessee fails to comply with this Lease":

| | |
|---|---|
| Installation (additional vehicle)- Contact SkyFineUSA | Early Service Reset Fee (each): $59.00 |
| Change of Vehicle* (Standard Vehicle): $159.95 - $299.95 | Missed Appointment: $25.00 |
| Mobile Service Call: $75.00 minimum | Out of State Reporting Fee: $35.00 |
| Removal: $129.00 minimum | Declined Payment Fee: $35.00 |
| Lockout Fee: $75.00 | Late Payment Fee: $25.00 (every 5 business days) |
| Tampering (per incident): $250.00 | After Hours Service Fee: $100.00 Per Hour (1 Hour Min.) |
| $50.00 Violations Fee (starting at 3 violations in a monitoring interval) | Override Code Fee (each): $50.00 - Remote Lockout Unlock Code/Link Fee (each): $175.00 - Mechanic Shop Override Code Fee (each) $75.00 |

| $25.00 Fee for Walk-In Appointments | Removal of Device by NON-SkyFineUSA Employee: $350.00 + Tampering Fee |
|---|---|

*Id.*

44.     Under the second table, within the text of the Lease, Defendant warns that "Lessee assumes full responsibility for any loss or damage to the system while in Lessee's possession" at a "replacement cost of $2,500.00," or individual component costs of "Handset, $1600.00; Handset cord $200; Control Box, $900.00; Camera, $850." *Id.*

45.     On the fourth page of the Lease, within the text of the agreement and lacking any heading, Defendant states that "Lessee agrees to use the SkyFineUSA service app and an additional $7.99 will be added on each month to the lessee's monthly lease payment." *Id.* at 4.

46.     Defendant also indicates on the fourth page that the "Insurance policy covers up to $2,500.00 for any damage incurred to the interlock system due to vehicle accidents and specific vehicle malfunctions," and that the "Insurance policy is $5.50 per month with a $500 Deductible and is non-refundable." *Id.*

47.     On the fifth page of the Lease, Defendant warns that "[i]n the event that one or more of the items referenced under 'Non-Compliance' occurs, then the lessee agrees that the following may occur in order for SkyFineUSA to regain any property or necessary payments: Impound vehicle to remove the Interlock Device (Impound/Lot Fee of $45/Day will be assessed)." *Id.* at 5.

48.     On the sixth page of the Lease, Defendant provides that "[c]harges that are disputed through customers credit card company and are found to be accurate charges, whereas

SkyFineUSA wins the dispute and the money is returned to SkyFineUSA, will generate a $75.00 fee that will be charged to the customer's account." *Id.* at 6.

49.     On the tenth page of the Lease, Defendant reiterates the $25.00 late fee "for every 5 business days that" payment is overdue, as well as the replacement costs of $2,500.00 for the entire system or $1,600.00 for damage to the hand unit.

50.     There is no single disclosure anywhere in the Lease for the total amount Plaintiff must pay to Defendant at lease signing.

51.     There is no single disclosure anywhere in the Lease for the total amount of periodic payments that Plaintiff must pay to Defendant.

52.     There is no single disclosure anywhere in the Lease for the total amount of all payments—inclusive of periodic payments and other fees and charges—that Plaintiff must pay to Defendant.

53.     On or about March 28, 2022, Defendant notified Plaintiff of a service price increase of $12.99 per month effective April 1, 2022 due to recent increases in gasoline prices.

54.     Plaintiff thereafter paid this additional $12.99 monthly charge to Defendant.

55.     Plaintiff ultimately kept Defendant's ignition interlock device in his personal vehicle for more than 11 months, or until approximately November 1, 2022.

56.     During these 11 months, Plaintiff paid Defendant more than $2,034 in total for use of the leased system in his personal vehicle.

57.     When Plaintiff signed the Lease, he was unaware of the requirement to use Defendant's "service app" and the associated monthly fee for doing so.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(b)(3) on behalf of a class defined as:

> All persons (1) in Utah or California (2) to whom SkyFine USA, LLC leased
> an ignition interlock device for personal, family, or household purposes, (3)
> with an initial lease term greater than four months, (4) for which the lease
> agreement is currently in force or was terminated on or after June 10, 2022,
> and (5) and in connection with which SkyFine USA, LLC failed to provide,
> prior to the consummation of the lease, segregated written disclosures
> informing the lessee of (a) the amount due at lease signing; (b) the total
> amount of periodic payments; (c) the total amount of other charges payable to
> SkyFine USA, LLC, itemized by type and amount, which are not included in
> the periodic payments; (d) the total of payments owed under the lease; (e) a
> statement of whether or not the lessee has the option to purchase the leased
> property; or (f) a statement referencing other requisite, non-segregated
> disclosures.

59.     Excluded from the class is Defendant, its officers and directors, and any entity in

which Defendant has or had a controlling interest.

60.     The proposed class satisfies Rule 23(a)(1) because, upon information and belief, it

is so numerous that joinder of all members is impracticable.

61.     The exact number of class members is unknown to Plaintiff at this time and can

only be determined through appropriate discovery.

62.     The proposed class is ascertainable because it is defined by reference to objective

criteria.

63.     In addition, the proposed class is identifiable in that, upon information and belief,

the names and addresses of all members of the proposed class can be identified in business

records maintained by Defendant.

64.    The proposed class satisfies Rules 23(a)(2) and (3) because Plaintiff's claims are typical of the claims of the members of the class.

65.    To be sure, Plaintiff's claims and those of the members of the class originate from the same standardized lease form utilized by Defendant, and Plaintiff possesses the same interests and has suffered the same injuries as each member of the proposed class.

66.    Plaintiff satisfies Rule 23(a)(4) because he will fairly and adequately protect the interests of the members of the class and has retained counsel experienced and competent in class action litigation.

67.    Plaintiff has no interests that are contrary to or irrevocably in conflict with the members of the class that he seeks to represent.

68.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since, upon information and belief, joinder of all members is impracticable.

69.    Furthermore, as the damages suffered by individual members of the class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the class to individually redress the wrongs done to them.

70.    There will be no extraordinary difficulty in the management of this action as a class action.

71.    Issues of law and fact common to the members of the class predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the class.

72.    Among the issues of law and fact common to the class:

a.  Defendant's violations of the CLA as alleged herein;

b.  Defendant's use of form ignition interlock lease agreements;

c.  Defendant's practice of providing these ignition interlock lease agreements without proper segregated disclosures as required by the CLA;

d.  the availability of statutory penalties; and

e.  the availability of attorneys' fees and costs.

**COUNT I: VIOLATIONS OF 15 U.S.C. § 1667A AND 12 C.F.R. PT. 1013.4**

73.  Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 72.

74.  The CLA at section 1667a requires in pertinent part that "[e]ach lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:"

(1)  A brief description or identification of the leased property;

(2)  The amount of any payment by the lessee required at the inception of the lease;

(3)  The amount paid or payable by the lessee for official fees, registration, certificate of title, or license fees or taxes;

(4)  The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

\* \* \*

(9)  The number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments.

75.     Regulation M builds upon these requirements, further demanding that certain disclosures be made in a "segregated" manner separate and apart from all other information contained in a consumer lease:

> The following disclosures shall be segregated from other information and shall contain only directly related information: §§ 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1). The headings, content, and format for the disclosures referred to in this paragraph (a)(2) shall be provided in a manner substantially similar to the applicable model form in appendix A of this part.

12 C.F.R. pt. 1013.3(a)(2).

76.     Among the disclosures required to be "segregated" in such a manner:

**(b) Amount due at lease signing or delivery.** The total amount to be paid prior to or at consummation or by delivery, if delivery occurs after consummation, using the term "amount due at lease signing or delivery." The lessor shall itemize each component by type and amount, including any refundable security deposit, advance monthly or other periodic payment, and capitalized cost reduction; and in motor vehicle leases, shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance, rebates, noncash credits, and cash payments in a format substantially similar to the model forms in appendix A of this part.

**(c) Payment schedule and total amount of periodic payments.** The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments.

**(d) Other charges.** The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments. Such charges include the amount of any liability the lease imposes upon the lessee at the end of the lease term; the potential difference between the residual and realized values referred to in paragraph (k) of this section is excluded.

**(e) Total of payments.** The total of payments, with a description such as "the amount you will have paid by the end of the lease." This amount is the sum of the amount due at lease signing (less any refundable amounts), the total amount of periodic payments (less any portion of the periodic payment paid at lease signing), and other charges under paragraphs (b), (c), and (d) of this section. In an open-end lease, a description such as "you will owe an additional amount if the actual value of the vehicle is less than the residual value" shall accompany the disclosure.

15

\* \* \*

**(i) Purchase option.** A statement of whether or not the lessee has the option to purchase the leased property, and:

> **(1) End of lease term.** If at the end of the lease term, the purchase price; and

\* \* \*

**(j) Statement referencing nonsegregated disclosures.** A statement that the lessee should refer to the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

\* \* \*

12 C.F.R. pt. 1013.4.

77.     In short, the CLA and Regulation M together require that a lessor like Defendant make explicitly clear to a lessee like Plaintiff precisely what he must pay under the proposed lease, when he must pay it, and under what circumstances he must make such payments.

78.     But here, Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 in several respects by failing to provide, prior to the consummation of the Lease, many disclosures—and many segregated disclosures—in the form and manner required by the CLA and Regulation M.

79.     Specifically, section 1667a(2) requires "a clear and conspicuous" disclosure of "[t]he amount of any payment by the lessee required at the inception of the lease."

80.     But Defendant does not explain adequately in the Lease what amount Plaintiff is required to pay at lease inception.

81.     On the third page, Defendant itemizes four fees to "be paid by the Lessee beginning on the commencement date of this lease and continuing until termination of this

agreement": (1) "Standard Installation Fee: $100.95 & Up" [but shown with an accompanying "0.00"]; (2) "Equipment Lease per Month" of "59.95"; (3) "$35.00 DMV/Court Submission Fee (due at the time of installation)" of "35.00"; and (4) "Insurance (Per Month): $5.50" [shown with an accompanying "5.5"]. Ex. B at 3.

82.    When read individually and collectively, it is unclear which amount Plaintiff owes.

83.    For example, it is not clear whether the "Standard Installation Fee" he must pay is $100.95, something greater than $100.95, or $0.00.

84.    As to section 1667a(3), which requires "a clear and conspicuous" disclosure of "[t]he amount paid or payable by the lessee for official fees, registration, certificate of title, or license fees or taxes," Defendant does not explain what amounts of tax(es) are owed in connection with Plaintiff's payments.

85.    Instead, Defendant simply states that "[t]he following fees *plus tax may apply* especially if Lessee fails to comply with this Lease Agreement and/or company policies as provided to the Lessee." Ex. B at 3.

86.    As to section 1667a(4), which requires "a clear and conspicuous" disclosure of "[t]he amount of other charges payable by the lessee not included in the periodic payments," including "a description of the charges," Defendant does not adequately explain what "other charges" are payable, and when.

87.    The Lease is particularly confusing in that Defendant lists several types of fees beyond the monthly equipment charge, including, but not limited to, a $159.95-$299.95 "Change of Vehicle" fee; $75.00 minimum for a "Mobile Service Call"; $75.00 "Lockout Fee"; $250.00

for "Tampering (per incident)"; $59.00 "Early Service Reset Fee"; $25.00 for a missed appointment; $35.00 "Out of State Reporting Fee"; and $50.00 "Override Code Fee." *Id.*

88.     But Defendant states that these fees only "may apply," *id.*, and the circumstances triggering their application are unclear.

89.     As to section 1667a(9), which requires "a clear and conspicuous" disclosure of "[t]he number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments," Defendant's disclosures are deficient in failing to dictate the number, amount, and due dates of Plaintiff's required monthly payments under the lease, as well as the total amount of such monthly payments Plaintiff owes. *See id.*

90.     While Defendant lists a fee of "59.95" for "Equipment Lease per Month" and $5.50 for "Insurance (Per Month)," it is not clear whether any other fees or taxes also will be charged on a monthly basis.

91.     Then, on the next page of the Lease, buried in the fine print of the agreement and entirely separated from the earlier listings of fees and charges, is an additional fee of $7.99 to "be added on each month to the lessee's monthly lease payment" for usage of Defendant's "service app." *Id.* at 4.

92.     From Plaintiff's experience, declining use of Defendant's "service app" is not optional, so Defendant regularly charged him an additional $7.99 during his lease term.

93.     Had Plaintiff understood at the time he signed the Lease that he would be required to use Defendant's "service app" and pay an additional $7.99 per month to do so, he would not have signed the Lease and instead would have looked elsewhere for an ignition interlock device.

94.    Turning to Regulation M's requirements for certain "segregated" disclosures, nowhere in the Lease does Defendant list an "amount due at lease signing or delivery," nor does Defendant otherwise explain adequately what amount of money is due at the lease signing—let alone in a "segregated" manner—in contravention of 12 C.F.R. pt. 1013.4(b). *See generally* Ex. B.

95.    In contravention of 12 C.F.R. pt. 1013.4(c), Defendant fails to explain in the Lease the number, amount, and due dates or periods of payments, nor does it explain the total of periodic payments owed by Plaintiff.

96.    To be sure, while Defendant lists "59.95" for "Equipment Lease per Month" and $5.50 for "Insurance (Per Month)," it does not then specify: (i) the number of monthly payments required; or (ii) whether any of the various other fees listed immediately adjacent to, and below, these particular fees will be charged monthly; or (iii) the total of the monthly payments Plaintiff owed under the Lease. *See* Ex. B at 3.

97.    As to 12 C.F.R. pt. 1013.4(d), Defendant's Agreement similarly fails to adequately specify what "other charges" will be applied, and when.

98.    More particularly, Defendant does not indicate in the Lease precisely when, or how often, or under what circumstances, various listed fees—like the "Change of Vehicle" fee, "Mobile Service Call" fee, "Lockout Fee," "Tampering (per incident)" fee, "Early Service Reset Fee," "Out of State Reporting Fee," or "Override Code Fee"—would be charged. *See* Ex. B at 3.

99.    Further, Defendant does not indicate in the Lease that an additional $12.99 monthly charge would be imposed during the lease term, as occurred effective April 1, 2022.

100.    As to 12 C.F.R. pt. 1013.4(e), nowhere in the Lease does Defendant disclose "the amount [Plaintiff] will have paid by the end of the lease," or something similar.

101.    Defendant never tallies the total amount of money owed under the Lease—which would include any upfront fees, monthly charges, and other one-time fees required of Plaintiff. *See generally* Ex. B.

102.    Interestingly, on the tenth page of the Lease, Defendants refers to a "Grand Total" purportedly referenced earlier in the "Fees & Payments" section; however, this is no such "Grand Total" listed in that section or elsewhere in the Lease.

103.    As to 12 C.F.R. pt. 1013.4(i), Defendant does not explain in the Lease whether Plaintiff has the option to purchase his ignition interlock device, and if at the conclusion of the lease, at what price. *See generally* Ex. B.

104.    Regarding 12 C.F.R. pt. 1013.4(j), Defendant fails to include in the Lease a statement referring Plaintiff to the remainder of the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable. *See generally* Ex. B.

105.    Indeed, such a statement is entirely missing from the Lease, likely because Defendant makes little-to-no effort to segregate these necessary disclosures to begin with, as required by law.

106.    To the extent any of the above-described disclosures may be found scattered throughout the *ten pages* of the Lease, Defendant still failed to meet its burden under the CLA and Regulation M because any such disclosures are *not* properly segregated from other

information in the lease, and *not* provided in a manner substantially similar to the applicable model form. *Compare* Ex. A *with* Ex. B.

107.   The Lease presented to Plaintiff is precisely what the CLA and Regulation M were enacted to avoid—a confusing onslaught of lease terms failing completely to "focus[] the consumer's attention on key information," as the Board intended.

108.   And Defendant's omissions are significant: at the time Plaintiff signed the Lease, he was confused and unsure as to many of its terms, including (i) that a separate fee would be charged monthly for using Defendant's "service app"; (ii) the exact amount of each periodic payment required under the Lease; (iii) the total amount of money he owed under the Lease; (iv) whether and to what extent other charges may be assessed beyond his periodic payments (such as the "Early Service Reset Fee," "Out of State Reporting Fee," or "Override Code Fee"); and (v) whether he had the option to purchase the leased property at the conclusion of the Lease (and if so, at what price).

109.   Confusion of this magnitude is tantamount to deception on the part of Defendant; at signing, Plaintiff remained oblivious as to the true costs of the lease agreement. *See McQuinn v. Bank of Am., N.A.*, 656 F. App'x 848, 849 (9th Cir. 2016); *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 210 (D. Conn. 2001).

110.   In other words, the confusion Defendant created is exactly the type of harm that the Board sought to address in implementing, and later amending, Regulation M.

111.   The harm Plaintiff suffered is particularized in that the violative lease agreement was presented to him personally, regarded his personal obligations in connection with the lease

of an ignition interlock device, and failed to give him statutorily mandated disclosures to which he was entitled.

112.    Likewise, the CLA's disclosure provisions

serve[] to protect a consumer's concrete interest in "avoid[ing] the uninformed use of credit," a core object of the TILA. These procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's own actions can affect his rights with respect to credit transactions. A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

*Strubel v. Comenity Bank*, 842 F.3d 181, 190-91 (2d Cir. 2016) (emphasis in original).

113.    No matter, that risk of real harm materialized here, as Plaintiff was unaware of, and oblivious to, the true costs associated with his lease of the ignition interlock device as a result of Defendant's inadequate disclosures, and thus potentially paid more money than he otherwise would have paid had he been aware of the true cost of the Lease and therefore known to shop for other options.

114.    Had Plaintiff known of the true costs involved, and of his requirement to use and pay monthly for Defendant's "service app," Plaintiff would not have signed the Lease and instead would have pursued other alternatives for an ignition interlock device for his vehicle.

115.    Further, the risk of real harm materialized in that Plaintiff paid Defendant a total of more than $2,034 over several months pursuant to the Lease.

**WHEREFORE**, Plaintiff respectfully requests relief and judgment as follows:

A.    Determining that this action is a proper class action and designating him as class representative under Rule 23 of the Federal Rules of Civil Procedure;

22

B.      Adjudging and declaring that Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 for its failure to provide Plaintiff or members of the proposed class requisite segregated disclosures concerning their leases of Defendant's ignition interlock devices;

C.      Awarding Plaintiff and members of the proposed class actual damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(1), and/or statutory damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(2)(B);

D.      Awarding Plaintiff and members of the proposed class their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1640(a)(3) and Rule 23 of the Federal Rules of Civil Procedure;

E.      Awarding Plaintiff and members of the class any pre-judgment and post-judgment interest as may be allowed under the law; and

F.      Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

DATED:  June 9, 2023

ANDERSON & KARRENBERG

*/s/ Jared D. Scott*
*Jared D. Scott*
*Jacob W. Nelson*

and

GREENWALD DAVIDSON RADBIL PLLC

*Attorneys for Plaintiff*